UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| **JERRY ROY JOHNSON, JR.** | * | **CIVIL ACTION NO. 12-2701** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **CAROLYN W. COLVIN, ACTING COMMISSIONER, SOCIAL SECURITY ADMINISTRATION** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits. The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons assigned below, it is recommended that the decision of the Commissioner be **REVERSED and REMANDED for further proceedings.**

## Background & Procedural History

Jerry Johnson, Jr. protectively filed the instant application for Title XVI Supplemental Security Income payments on November 21, 2007. (Tr. 234-236).[1] He alleged disability as of September 15, 2007, because of "back & neck problems-previously broken." (Tr. 256). The state agency denied the claim at the initial stage of the administrative process. (Tr. 89-90, 115-118). Thereafter, Johnson requested and received a December 4, 2008, hearing before an

---

[1] Johnson apparently filed a prior application(s) on April 3, 2006, alleging disability as of August 13, 2005. *See* Tr. 245. The claim was denied administratively. On May 13, 2008, Johnson appealed the Commissioner's final decision to this court. *See Johnson v. Astrue*, Civil Action No. 08-0645 (W.D. La.). However, on January 5, 2009, the District Court dismissed the case because of Johnson's repeated failure to abide court orders. *Id*. [doc. #s 9 & 10].

Administrative Law Judge ("ALJ"). (Tr. 26-48). However, in a May 7, 2009, written decision, the ALJ determined that Johnson was not disabled under the Social Security Act, finding at step five of the sequential evaluation process that he was able to make an adjustment to work that exists in substantial numbers in the national economy. (Tr. 91-99). Accordingly, Johnson appealed the adverse decision to the Appeals Council. On December 16, 2010, the Appeals Council granted Johnson's request for review, vacated the ALJ's decision, and remanded the case for further proceedings. (Tr. 111-114). The Appeals Council noted that on July 10, 2009, Johnson had protectively filed a new application for Title XVI Supplemental Security Income payments, alleging disability as of May 10, 2009. *See* Tr. 113, 162-164, 242-243, 289, 295.[2] The Appeals Council's action rendered the subsequent application duplicate; therefore, it directed the ALJ to associate the two claims upon remand. (Tr. 113).

On remand, a supplemental hearing, was held on April 18, 2011, before ALJ Gordan Momcilovic, via video conference. (Tr. 49-73). In an April 27, 2011, written decision, Judge Momcilovic determined that Johnson was not disabled under the Social Security Act, finding at step five of the sequential evaluation process that he was able to make an adjustment to work that exists in substantial numbers in the national economy. (Tr. 6-19). Johnson again appealed the adverse decision to the Appeals Council. On August 15, 2012, however, the Appeals Council denied Johnson's request for review; thus, the ALJ's decision became the final decision of the Commissioner. (Tr. 1-3).

---

[2] The state agency denied the new application at the initial stage of the administrative process. (Tr. 108-109, 168-171). It appears that Johnson also filed a new application for Title II Disability Insurance Benefits on August 3, 2009. (Tr. 160-161). However, there is no indication that this Title II application was further processed -- in all likelihood because Johnson alleged disability as of September 15, 2007, which was well after the date that he was last insured for Title II benefits (December 2006). *See* Tr. 250.

On October 16, 2012, Johnson filed the instant complaint for review before this court. He contends, in essence, amongst other things, that the ALJ's residual functional capacity assessment is not supported by substantial evidence.

## Standard of Review

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. at 401. Substantial evidence lies somewhere between a scintilla and a preponderance. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citation omitted).

## Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D). The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. § 423(d)(2)(A). Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows,

(1) An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2) An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

(3) An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

(4) If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5) If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of

performing work in the national economy and is therefore not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987). When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated. *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## The ALJ's Findings

I. Steps One, Two, and Three

The ALJ determined at step one of the sequential evaluation process that the claimant did not engage in substantial gainful activity during the relevant period. (Tr. 11). At step two, he found that he suffers from severe impairments of cervical and lumbar degenerative disc disease, alcohol abuse, and borderline intellectual functioning. (Tr. 11-12). *Id.*[3] He concluded, however, that these impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process. (Tr. 12-14).

II. Residual Functional Capacity

The ALJ next determined that Johnson retained the residual functional capacity ("RFC") to perform light work, except that he cannot climb ladders, ropes, or scaffolds and can perform all other postural activities only occasionally. (Tr. 14).[4] Also, he cannot perform work which

---

[3] The ALJ determined that Plaintiff's medically determinable impairments of cerebral and cerebellar atrophy, bilateral hearing loss, mild speech impediment, and hypertension were non-severe. (Tr. 11-12).

[4] Light work entails:
> . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves

requires that he keep his head in the same position for longer than one hour continuously. *Id*. Finally, he only can perform work with simple job instructions and work-related tasks. *Id*.

III.     Steps Four and Five

The ALJ concluded at step four of the sequential evaluation process that Johnson was unable to perform his past relevant work. (Tr. 17-18). Accordingly, he proceeded to step five. At this step, the ALJ determined that, as of the date that he applied for disability, Johnson was a younger individual, with at least a high school education and the ability to communicate in English. *Id*. Transferability of skills was not material. *Id*. He then observed that given Johnson's vocational factors, and if he were capable of performing the full range of light work, the Medical-Vocational Guidelines would direct a finding of not disabled. 20 C.F.R. § 404.1569; Rule 202.21, Table 2, Appendix 2, Subpart P, Regulations No. 4. *Id*. However, because Johnson's residual functional capacity did not permit him to perform the full range of light work, the ALJ consulted a vocational expert ("VE") to determine whether, and to what extent his additional limitations eroded the occupational base for unskilled light work. (Tr. 17-18). In response, the VE identified the representative jobs of price marker, *Dictionary of Occupational Titles* ("DOT") Code # 209.587-034; cashier II, DOT Code # 211.462.010; and hotel housekeeper, DOT Code # 323.687-014, that were consistent with the ALJ's RFC and Johnson's

---

sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

vocational profile. *Id*.[5]

## Analysis

I.  **Residual Functional Capacity**

    a)    <u>Chronology of Relevant Medical Evidence</u>

An August 29, 2006, CT scan of the cervical spine showed minimal spurring at C4-5, with more significant degenerative spurring posteriorly at C5-6 and C6-7. (Tr. 85). There was mild canal narrowing at the C5-6 and C6-7 level secondary to degenerative spurring. *Id*. There was no evidence of a fracture, with mild narrowing of the neural foramina at C4-5. *Id*. No major changes from the study done in March 2006. *Id*.

In a November 30, 2006, note, Plaintiff's treating neurosurgeon, Bernie McHugh, M.D., wrote that Johnson's range of motion in his cervical spine was significantly limited. (Tr. 270).

A December 31, 2006, CT scan of the brain showed advanced cerebral and cerebellar atrophy. (Tr. 86).

On May 17, 2007, Dr. McHugh noted that plain x-rays showed no significant abnormality. (Tr. 378). However, Johnson still complained of cervical pain and discomfort. *Id*.

On November 1, 2007, McHugh wrote that Johnson was unable to work because of limited range of motion following a cervical spine fracture. (Tr. 271, 382).

On November 15, 2007, Dr. McHugh documented that he had been following Johnson in

---

[5] The VE testified that for the price marker job, there were 459,324 positions nationally and 5,568 jobs regionally (reduced by 25% to eliminate part-time work). (Tr. 18, 69-70). For the cashier II job there were 1,728,122 positions nationally and 32,549 jobs regionally (reduced by 50% to eliminate part-time work). (Tr. 18, 69-70). For the hotel housekeeper job there were 237,888 positions nationally, and 3,815 jobs in Louisiana (reduced by 30% to eliminate part-time work). *Id*. This incidence of jobs constitutes a significant number of jobs in the "national economy." 42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

his office for traumatic cervical spine injury. (Tr. 377). Physical therapy was discontinued, and he was left with chronic pain syndrome of the cervical spine. *Id*. He continued to experience decreased range of motion. *Id*. McHugh discussed with Johnson the unlikelihood of his being able to return to any type of *manual labor* activity. *Id.* (emphasis added). He was to return in six months for followup. *Id.*

On December 6, 2007, a nurse practitioner wrote that Johnson had a significantly limited cervical spine range of motion through December 31, 2006. (Tr. 273).

On January 19, 2008, Johnson underwent a physical examination administered by consultative physician, Scott Cantwell, M.D. (Tr. 386-389). Johnson reported that he had been having problems since his August 13, 2005, fall from a 26' high scaffold. *Id.* He stated that he had broken cervical vertebrae, several lumbar fractures, and broken ribs on the right side, with constant pain since the accident. *Id.* He underwent physical therapy with minimal relief. *Id.* He denied radiculopathy, including weakness, and paresthesias. *Id.* He stated that he could not lift anything because of his neck injury. *Id.* He complained of constant lumbar pain since the fall. *Id.* His pain tended to come and go for days at a time, and was aggravated by sitting. *Id.* He stated that he could sit for approximately one to two hours, and walk approximately one quarter of a mile. *Id.* He denied any change in hearing, chest pain, palpitations, edema, etc. *Id.* He also denied syncope, seizures, weakness, tremor, sensory loss or dysfunction. *Id.*

Upon examination, Cantwell observed that Johnson's neck was rigid and flexed at a 30 degree angle. *Id*. He exhibited no muscle asymmetry, atrophy, or involuntary movements, structural deformity, effusion, or periarricular swelling. *Id*. He had a normal gait, with the ability to rise from a sitting position without assistance, and heel and tandem walk without problem. *Id.* He was able to bend and squat without difficulty. *Id.* He demonstrated 5/5 grip

strength with adequate fine motor movements, dexterity, and ability to grasp objects bilaterally. *Id.*  He was alert and oriented, and cooperative. *Id.*  He did not appear depressed or anxious. *Id.*  He had good insight and cognitive function. *Id.*  He exhibited strong neck movement against resistance and good shoulder shrug. *Id*.  He had good tone, 5/5 strength bilaterally in all muscle groups. *Id.*  Sensory and reflexes were normal. *Id.*  X-ray of the cervical spine was normal. *Id.*  X-ray of the lumbar spine, however, showed severe degenerative changes in the lumbosacral area. *Id.*

Cantwell diagnosed hypertension, chronic neck pain, chronic low back pain, and degenerative changes of the lumbosacral spine. *Id.*  He noted that Johnson had physical (decreased range of motion) and radiographic findings to support his claim. *Id.*  Cantwell opined that Johnson likely would experience difficulty with sitting, walking or standing for a full workday and lifting/carrying more than 20 pounds. *Id.*  However, he could hold a conversation, respond appropriately to questions, and carry out and remember instructions. *Id.*

In an April 22, 2008, note, a physician from E. A. Conway Hospital wrote that Johnson had high blood pressure that was fairly well controlled. (Tr. 380).  He also had abnormal liver tests, which were stable, plus elevated cholesterol. *Id.*

In a May 15, 2008, note, Dr. McHugh wrote that he had been following Johnson since August 14, 2005. (Tr. 390).  He stated that Johnson has been unable to work since the event. *Id.*

An August 9, 2008, note from LSU E. A. Conway reflects that Johnson was not in any pain. (Tr. 441).  He was doing "so so" with his alcohol abuse. *Id.*  He reported that he experienced the "shakes" when he stops. *Id.*

A September 12, 2008, CT scan of the cervical spine showed compression involving the superior endplate and body of the C7 vertebrae. (Tr. 84).  There were degenerative changes

throughout the cervical spine resulting in some canal stenosis and neuroforaminal stenosis, but no fragments of bone in the canal or cord impingement due to the fracture at C7. *Id.*

On December 9, 2008, Johnson reported to E. A. Conway with abdominal pain. (Tr. 439). He was seen for follow-up for hypertension, AST/ALT, dyslipidemia, and alcohol abuse. *Id.* Johnson reported that he was doing well until court last week. *Id.* He was advised to stop drinking. *Id.*

On February 18, 2009, Johnson underwent a physical examination administered by consultative physician, Clinton McAlister, M.D. (Tr. 392-396). Johnson's chief complaint was neck and back pain. *Id.* He reported that his pain was 7-8 on a 10 point scale. *Id.* His pain level increased when he lay down. *Id.* He took Ibuprofen or Motrin for the pain. *Id.* He reported occasional paresthesias in the left arm, and problems standing or walking for over 20-30 minutes. *Id.* Johnson stated that he experiences pain with motion in his neck. *Id.* He has problems with bending and squatting. *Id.* He also has difficulty washing his hair, and entering/exiting the bathtub. *Id.*

McAlister observed that Johnson had the affect of someone with chronic brain syndrome although he denied prior use of alcohol or drugs. *Id.* He appeared to be in mild distress. *Id.* He was alert, cooperative, and oriented. *Id.* He had little difficulty moving from supine to sitting position or from sitting to standing. *Id.* However, he had some problems with bending and squatting. *Id.* He walked with a slow gait. *Id.* He was incapable of toe walking or heel walking. *Id.* McAlister documented that it was impossible to test the range of motion in his neck. *Id.* Any effort at moving the neck was met by significant resistance. *Id.* However, he was observed to move his neck voluntarily. *Id.* There were no spasms or radicular findings. *Id.* It was impossible to test the range of motion of the shoulders, elbows, and wrists because of voluntary

resistance. *Id.* However, he was capable of fine manipulation, opposition, gripping and grasping bilaterally. *Id*. He demonstrated poor effort at pinch and grip strength. *Id.*

McAlister diagnosed degenerative arthritis of the cervical spine, with an old compression fracture at C-7 and degenerative arthritis of the lumbosacral spine with narrowing at L5-S1. *Id.* He opined that Johnson had some definite pathology in his cervical and lumbar spines. *Id.* However, the objective findings did not substantiate the subjective complaints. *Id.* Also, there was evidence of significant symptom magnification. *Id.* McAlister opined that Johnson could perform at a restricted light duty activity level with maximum lifting of 20 pounds occasionally and 10 pounds frequently. *Id.* Sitting, standing, and walking should be changed every 30 minutes. *Id.*

McAlister also completed a medical source statement. (Tr. 397-402). He indicated that Johnson could frequently lift and carry up to 10 pounds and occasionally up to 20 pounds. *Id.* He could sit, stand, and walk, each for up to 30 minutes at a time. *Id.* He could sit for a total of five hours, stand for a total of one hour, and walk for a total of two hours in an eight hour work day. *Id.* He could frequently reach, handle, finger, feel, push/pull, and operate foot controls. *Id.* Although he could never climb ladders or scaffolds, he occasionally could climb stairs, ramps, balance, stoop, kneel, crouch, and crawl. *Id.* Hearing and vision were not evaluated. *Id.* He could never be exposed to unprotected heights, but could frequently be exposed to other environmental considerations. *Id.* He also could tolerate noise up to the level of loud heavy traffic. *Id.*

An E. A. Conway Clinic record from April 2, 2009, indicated that Johnson's pain was 3-4 on a 10 point scale. (Tr. 437). He had not taken his hypertension medication for the past three days. *Id*. He was advised to comply with his medication and to stop drinking. *Id.*

On July 9, 2009, Johnson had not taken his blood pressure medicine in three days. (Tr. 446). He reported that he could obtain his medication, but had not done so. *Id.*

Upon referral of Dr. McHugh, Johnson underwent a functional capacity evaluation on September 9, 2009. (Tr. 420-435). The physical therapist indicated that Johnson provided an undetermined effort. *Id*. Nonetheless, he was able to constantly walk, frequently lift 10 pounds, stoop occasionally, balance. *Id*. He had no functional limitations. *Id.* The physical therapist stated that Johnson would be unable to safely return to work in his present condition. *Id*. He would need a work hardening program to increase overall strength and conditioning. *Id.*

On October 6, 2009, Johnson underwent a psychological evaluation administered by consultative psychologist, David Williams, Ph.D. (Tr. 449-455). Williams reviewed Johnson's medical records. *Id.* Johnson reported that his pain was a 5/10, and that at its worst, his pain was a 9. *Id.* He said that he felt anxious because he sits around all of the time now. *Id.* He commented that his physical problems were the primary reason that he could not work. *Id.* He reported that he had never been a heavy alcohol or drug user. *Id.* Williams noted that Johnson's judgment was good, and his ability to attend and maintain focus was intact. *Id.* He tolerated the stress of the interview without problem. *Id.* Williams diagnosed pain disorder with psychological factors and medical condition chronic (provisional). His assigned a current GAF of 65. *Id.*[6] His concentration, pace, and persistence were adequate. *Id.* His understanding was

---

[6] "GAF is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'" *Boyd*, 239 F.3d at 701 n2 (citing AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994) (DSM-IV)).

A GAF of 61-70 indicates "**[s]ome mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships**." DSM-IV, pg. 32.

intact. *Id*. Williams did not discern any overt effort to exaggerate symptoms of mental illness. *Id.*

On October 7, 2009, non-examining agency psychologist, Linda Hartwell determined that Johnson's mental impairment(s) were non-severe. (Tr. 457-471).

An October 8, 2009, x-ray of the cervical spine revealed degenerative disc changes at C2-3 level and C3-4 level with hypertropic osteophytes anteriorly. (Tr. 83). There was no evidence of a recent fracture.

In a February 23, 2010, note, Dr. McHugh wrote that Johnson was being followed in his office post on-the-job injury where he suffered a cervical laminar fracture and compression fracture. (Tr. 82). He was being treated conservatively. *Id.* No acute pathology was noted. *Id.* He underwent a functional capacity examination, which determined him unable to return any gainful employment. *Id*. McHugh concurred in the finding. *Id*. McHugh further noted that Johnson had significant hearing difficulty. *Id.* He was to be seen in six months for followup. *Id.*

In a December 7, 2010, note, Dr. McHugh wrote that he had followed Johnson since he suffered an on-the-job injury in 2005. (Tr. 81). He added that Johnson had been unable to work since that incident. *Id.* Johnson continues to experience chronic pain in his cervical region. *Id*. Johnson underwent a functional capacity examination wherein the examiner concluded that Johnson would be unable to work in his present condition. *Id.* McHugh concurred in the assessment. *Id*. McHugh noted that Johnson was unable to be up for more than one hour at a time. *Id.* He was to return in six months for followup. *Id.*

On February 21, 2011, Johnson underwent a second psychological evaluation with Dr. Williams. (Tr. 533-539). This time, Williams noted that Johnson had hearing difficulty was apparent during the interview. *Id.* Johnson reported that he was unable to work because he

13

would be paralyzed if he snapped his spinal cord. *Id.* He stated that he no longer could do the type of work that he had done all of his life. *Id.* He attributed his hearing problems to the fall. *Id.* He denied feeling depressed. *Id.* His sleep was disturbed secondary to pain. *Id.* During a typical day, he watches television, walks, cooks, and washes a few dishes. *Id.* He reported ten to fifteen "true friends." *Id.* He was able to use the telephone and take messages, but commented that he could "barely" hear on the phone. *Id.* His speech was marked by a mild stutter and slurred at times. *Id.* He was able to interact appropriately on a 1:1 basis, and had no difficulty tolerating the stress of the interview. *Id.* Social judgment was adequate. *Id.* Concentration, persistence, and pace were adequate. *Id.* He reported his current health as "good." *Id.* He did not report any history of heavy alcohol or drug use. *Id.* Williams assigned a GAF of 68. *Id.* Johnson's IQ was in the borderline range. *Id.*

Williams also completed a medical source statement (mental). (Tr. 540-542). He indicated mild to moderate limitations in Johnson's ability to understand, remember, and carry out complex instructions. *Id.* There were no other limitations. *Id.*

      b)    <u>Discussion</u>

In his decision, the ALJ reviewed the available evidence, including the hearing testimony, objective testing, Plaintiff's activities of daily living, and the findings of the treating and consultative physicians/psychologist. (Tr. 14-17). In deriving Plaintiff's RFC, the ALJ assigned "great weight" to the opinions of Drs. Cantwell and Williams because he deemed them consistent with the evidence of record. *Id.* However, he assigned "limited weight" to Dr. McAlister's opinion because he believed that it was influenced by Johnson's exaggeration of symptoms and minimal participation in testing. *Id.* The ALJ also assigned "limited weight" to Dr. McHugh's statements because the ALJ determined that they were inconsistent with McHugh's rather benign

14

physical examinations and progress notes. *Id.*[7] The ALJ also assigned "little weight" to the findings of the physical therapist, because a therapist is not an acceptable medical source, and a conclusion of disability is reserved to the Commissioner. *Id.*

With regard to the ALJ's purported reliance on Dr. Cantwell's opinion, the court notes that Dr. Cantwell opined that Johnson "would likely have difficulty with sitting, walking or standing for a full workday . . ." (Tr. 388).[8] The court fails to discern, however, how the foregoing opinion supports an RFC for light work, which requires, *inter alia*, the ability to stand or walk, off and on, for a total of approximately 6 hours of an 8-hour workday. *Titles II & XVI: Determining Capability to Do Other Work-the Med.-Vocational Rules of Appendix 2*, Social Security Ruling 83-10 (S.S.A 1983). Moreover, none of the other physicians' opinions are consistent with the ALJ's RFC.[9]

In lieu of the medical opinions, it is apparent that the ALJ autonomously derived Johnson's RFC. The court emphasizes that the lack of a medical source statement describing the types of work that the claimant is still capable of performing does not, in, and of itself, render the record incomplete. *Ripley v. Chater*, 67 F.3d 552, 557-558 (5th Cir. 1995). In *Ripley*, as here, the

---

[7] Ordinarily, a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." 20 C.F.R. § 404.1527(d)(2). "'[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th Cir.1995) (citation omitted). However, an ALJ cannot reject a medical opinion without an explanation supported by good cause. *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir.2000) (citations omitted).

[8] He further indicated that Johnson could not move his head backward at all. (Tr. 389).

[9] While Dr. Williams' findings provide support for the ALJ's assessment of Johnson's *mental* impairment(s), Williams, of course, is a psychologist and thus, did not contemplate the effects of Johnson's *physical* impairments.

Commissioner argued that the medical evidence substantially supported the ALJ's decision. *Ripley, supra*. The Commissioner pointed to medical reports discussing the extent of plaintiff's injuries, including a four year history of back troubles. *Id*. However, without reports from qualified medical experts, the Fifth Circuit could not conclude that the evidence substantially supported the ALJ's residual functional capacity assessment because the court was unable to determine the "effects of [plaintiff's] conditions, no matter how 'small.'" *Id*. The only evidence that described plaintiff's ability to work was plaintiff's own testimony, which, when read in proper context, failed to support the ALJ's residual functional capacity assessment. *Id*.

The instant case is materially indistinguishable from *Ripley, supra*. The record is devoid of a medical source statement that supports the ALJ's RFC. Moreover, Plaintiff's own testimony does not support the ALJ's residual functional capacity assessment. *See e.g.*, Tr. 37, 62. Under these circumstances, the court is constrained to find that the ALJ's assessment is not supported by substantial evidence. *See Williams v. Astrue*, 2009 WL 4716027 (5th Cir. Dec. 10, 2009) (unpubl.) ("an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions"); *Ripley, supra* (substantial evidence lacking where: no medical assessment of claimant's residual functional capacity, and claimant's testimony was inconsistent with ALJ's assessment); *Butler v. Barnhart*, Case Number 03-31052 (5th Cir. 06/02/2004) (unpubl.) (in the absence of medical opinion or evidence establishing that the claimant could perform the requisite exertional demands, the ALJ's determination is not supported by substantial evidence).

II.     **Step Five and Remand**

Because the foundation for the ALJ's step five determination was premised upon an RFC that is not supported by substantial evidence, the court further finds that the

Commissioner's ultimate conclusion that Plaintiff is not disabled also is not supported by substantial evidence.

Plaintiff urges the court to enter a judgment awarding benefits for the relevant period. "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. §405(g). When reversal is warranted, the matter is remanded with instructions to make an award only if the record enables the court to conclusively determine that the claimant is entitled to benefits. *See Ferguson v. Heckler*, 750 F.2d 503, 505 (5th Cir. 1985); *see also Rini v. Harris*, 615 F.2d 625, 627 (5th Cir.1980) (reversing and remanding with direction to enter judgment where the evidence was not substantial and the record clearly showed the claimant's right to benefits). The instant record is not so disposed. Plaintiff's residual functional capacity assessment remains indeterminate.

## Conclusion

For the above-stated reasons,

IT IS RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent herewith.[10]

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or

---

[10] The court need not address Plaintiff's remaining assignments of error. They may be considered upon remand.

response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 6th day of January 2014.

_____
KAREN L. HAYES
U. S. MAGISTRATE JUDGE